IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 7, 2014

STATE OF TENNESSEE v. ROMMEL OBLIGACION

Appeal from the Circuit Court for Crockett County
No. 4183     Clayburn Peeples, Judge

No. W2013-00702-CCA-R3-CD  -  Filed April 15, 2014

The Defendant, Rommel Obligacion, appeals from his jury convictions for three counts of felony reckless endangerment, contending that the evidence presented at trial was insufficient to support his convictions beyond a reasonable doubt and that the trial court improperly denied his requests for probation and judicial diversion. After reviewing the record and the applicable authorities, we conclude that the trial court failed to demonstrate on the record that it considered all the relevant judicial diversion factors, assigned weight to each factor, and explained how some factors outweighed others. This error, however, was harmless in light of the other findings made by the trial court. Therefore, we affirm the judgments of the trial court.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined; ROGER A. PAGE, J., concurring in a separate opinion.

Daniel J. Taylor, Jackson, Tennessee, for the appellant, Rommel Obligacion.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Garry Brown, District Attorney General; Larry Hardister and Hillary Lawler-Parham, Assistant District Attorneys General, for the appellee, State of Tennessee.

OPINION
FACTUAL BACKGROUND

The record reflects that a Crockett County grand jury indicted the Defendant for the following offenses on February 14, 2011: Count 1, aggravated assault of Deputy Allan

Gilliland, a Class C felony; Counts 2-4,[1] reckless endangerment, a Class E felony; and Count 5, resisting arrest, a Class A misdemeanor. A jury trial was held on February 28, 2011, where the following evidence, as relevant to this appeal, was presented.[2]

Penny Curtis, a detective with the Crockett County Sheriff's Office (CCSO), testified that she and Deputy Irvin were dispatched to Shawna Brown's house regarding a possible domestic disturbance. Upon arrival, she spoke with Ms. Brown who said that a verbal altercation had occurred earlier that day between the Defendant and Freddie Spinner, who placed the 911 call, but that there had been no issues between her and the Defendant. Det. Curtis then asked the Defendant to step outside and speak with her and the other officers; he complied. As the Defendant walked out of the house, Det. Curtis was standing to the front and side of him. He continued walking down the steps, and she asked him what was the bulge under his shirt. The Defendant responded by lifting his shirt, revealing a gun. Det. Curtis relayed,

> As soon as he puts his hand on it and I'm probably about an arm's length from him and he's right here, I said, 'Stop, stop, stop. Don't pull it. Don't pull it. Don't pull it. Stop.' It's coming out and I'm yelling at him, 'Stop, don't pull it,' and when he comes right here I'm thinking he's going to shoot us. He's going to shoot us, so my reaction was grab him and I did. I had a hold of him around his neck like this . . . and I was trying to take him in this direction away from the officers and that was in April, April 24th. . . . I couldn't get him to the ground, but I wasn't going to turn loose. . . . I knew what had to happen. Deputy Irvin came in and he grabbed a hold of both of us and took us all to the ground and I got caught underneath both the officer and [the Defendant] and I got injured when we had to go to the ground.

---

[1] Count 2 was based on the reckless endangerment of Detective Penny Curtis; Count 3 was based on the reckless endangerment of Deputy Jimmy Irvin; and Count 4 was based on the reckless endangerment of Detective Allan Gilliland.

[2] At the Defendant's request, reckless endangerment was charged as a lesser-included offense of aggravated assault, Count 1. As a result, the trial court instructed the jury not to render a verdict on Count 4, which was based on the reckless endangerment of Det. Gilliland. We are inclined to note that reckless endangerment is not a lesser-included offense of aggravated assault under the facts of this case, and ordinarily the Defendant's conviction for reckless endangerment with respect to Count 1 would be invalid. See State v. Moore, 77 S.W.3d 132, 135-36 (Tenn. 2002). However, our supreme court has held that when a defendant requests a jury instruction on an offense because he erroneously believed that such was a lesser-included offense, and that request is granted, such an affirmative action by the defendant constitutes effective consent to an amendment of the indictment to include that offense. See Demonbreun v. Bell, 226 S.W.3d 321, 324 (Tenn. 2007) (citing State v. Ealey, 959 S.W.2d 605, 612 (Tenn. Crim. App. 1997).

Det. Curtis explained that she reacted when the Defendant was bringing the gun out of the holster, bringing it straight up. She further explained that Deputy Irvin was standing behind Det. Gilliland when it all happened. However, she admitted on cross-examination that the whole incident happened in a matter of seconds.

Allan Gilliland, a detective with the CCSO, testified that he was present at Ms. Brown's house, assisting Det. Curtis and Deputy Irvin. He explained that he was primarily focused on the Defendant the entire time because the dispatch call mentioned that the Defendant might possibly have had a weapon in his possession. Det. Gilliland testified that Det. Curtis was standing by the doorway the Defendant came out of and that Deputy Irvin was standing near him. The Defendant came towards Det. Gilliland and raised his shirt, reaching for the weapon. Det. Curtis was behind the Defendant. According to Det. Gilliland,

> [E]verybody started saying something to him. I was telling him, 'Don't touch it, don't touch it.' As he approached me -- I mean, it all happened within probably, I'd say, four, five, six seconds. You know, he was already that close. As I seen him unholstering his weapon I grabbed mine and I started to unholster my weapon and I had to make the decision real quick. . . . Detective Curtis was coming in behind him. . . . I released my weapon back in my holster and took a step towards him and grabbed the weapon. I attacked the weapon, is what we call it. It's what we're trained to do if we're in close quarters and I disarmed him.

Det. Gilliland explained that he was about ten feet away when he realized that the Defendant had a weapon, and the Defendant continued walking towards him. The Defendant was coming straight at him, so he "stepped into [the gun and] went up." Deputy Irvin was in the "area when [he] went up with it." The incident happened within a matter of three to five seconds. When he gained control of the gun, it was loaded; there were rounds in the magazine and one in the chamber. Det. Gilliland testified that in his eighteen years as a law enforcement officer, he had been in "close calls" but never a situation like the instant case. On cross-examination, Det. Gilliland clarified that the entire incident, from the Defendant exiting the home to him disarming the Defendant, lasted approximately ten seconds.

Jimmy Irvin, a deputy with the CCSO, testified that he and Det. Curtis were dispatched to Ms. Brown's residence on April 24, 2009. Upon their arrival, Ms. Brown informed them that nothing had happened. Sometime thereafter, Det. Gilliland arrived. After speaking with Mr. Spinner and learning that the Defendant had a handgun on his person, the three officers discussed disarming the Defendant to avoid any problems. The officers then instructed Ms. Brown to go back into the house with her children and asked her to send the Defendant outside; she complied. The Defendant came outside, and Det. Curtis

"walked up behind him." Deputy Irvin was behind Det. Gilliland, and they were "closer to the roadway." The Defendant then pulled his weapon "like he was taking action" with it. Deputy Irvin testified that he "was ducking trying to get out of the way, because the weapon was pointed at [him,]" and he was "in fear of being shot -- serious bodily injury." At this point, Det. Curtis had come from behind the Defendant and was ordering him to get on the ground. Det. Gilliland "got the weapon from [the Defendant,] and then [he] took [Det.] Curtis and [the Defendant] . . . to the ground" and placed handcuffs on the Defendant. Deputy Irvin testified,

> I asked him why did he do that and he said that he was gonna hand the weapon to us, but then I told him, I said -- he advised us that he had a handgun permit and I told him, you know, "They teach in the handgun permit classes that you never touch the weapon. You let the officer know that you have a weapon on you. Never lay your hand on it."

The Defendant then relayed to Deputy Irvin that he helped teach the Tennessee handgun permit classes. Deputy Irvin testified that he had taken a handgun permit class in the past and that "you are strongly advised not to touch the weapon." Deputy Irvin further testified that Det. Gilliland later gave him the Defendant's weapon and that the weapon was fully loaded, eleven bullets in the magazine and one in the chamber. He also testified that the Defendant had another fully loaded magazine in the holster, for a total of twenty-three bullets. He could not remember whether the safety was on when Det. Gilliland handed him the weapon.

On cross-examination, Deputy Irvin clarified that, when the Defendant exited the house, he initially raised his shirt but that he immediately unholstered his weapon thereafter. He admitted that all three officers were giving the Defendant commands at once. Deputy Irvin also clarified that, when the Defendant pulled his weapon from its holster, it was pointed at Det. Gilliland, who then "challenged" the weapon. Deputy Irvin admitted that, at that point, he was approaching from the side, and the weapon did not come near him until the struggle for the weapon occurred and that it all happened very quickly. Deputy Irvin further admitted that, after placing the Defendant under arrest, he informed dispatch that the Defendant was taken into custody because he unholstered his weapon and not because he tried to assault, threaten, or shoot the officers.

Kevin Sugg, an expert in small weapons armory with twenty-five years' experience in law enforcement, testified about the Defendant's gun. He stated that the Defendant's weapon was a Springfield Armor high capacity compact. Officer Sugg testified that "this particular weapon was meant to carry locked back in a fire position with the safety engaged." He further testified that the gun had two safeties, a palm safety and a wing safety, and that,

although not technically considered an additional safety, it took approximately two pounds of pressure to pull the trigger. He also testified that the palm safety disengages as soon as the person puts his hand around it and exerts pressure. Officer Sugg testified that he had not ever seen that gun fire without the trigger being pulled but that anything could happen with a manmade weapon. On cross-examination, Officer Sugg agreed that a person could take a gun out of the holster and it still not be ready to fire.

The Defendant testified that after the incident involving Mr. Spinner that occurred earlier in the day on April 24, 2009, Mr. Spinner called Ms. Brown and informed her that he had called the police. Approximately ten minutes later, the police came to Ms. Brown's house, and she told the police that no one there had called the police and that they had not had any problems there. The Defendant testified that, as a matter of habit, he kept his gun "cocked and locked" in his holster and that he did not remove his weapon when he learned that the police were in route because the weapon was like "furniture" to his body. After speaking with Ms. Brown, Det. Curtis asked him to step outside and speak with her and the other officers; he complied. Upon walking outside, he informed Det. Curtis that he was armed and raised his shirt, displaying the weapon, and Det. Curtis "look[ed] away, which was kind of odd for [him]." He explained that he "was waiting on instructions" from Det. Curtis, and because he was stepping out of the house, he was walking towards her. He testified, "[A]fter she paused, didn't say anything, I volunteered to hand her the weapon, disarm myself." Then, he "pulled it out of the holster, pointed it down and as I dropped my hand my shirt falls right underneath that and holds the weapon." The Defendant further testified that his intent was "to render his weapon safe to surrender" to the officers and that the slide safety was never disengaged. He was looking down while he was doing this, breaking the line of sight between him and the officers, and the next thing he knew he "was on the ground." The Defendant testified that he did not think his having a weapon was a problem because, when the officers first arrived, he was walking around outside with his daughter with the weapon on his person, and the officers never mentioned or attempted to relieve him of the weapon.

On cross-examination, the Defendant admitted that he had gone through the handgun training class approximately three years prior but that he did not recall ever being taught not to touch the gun in the presence of police officers. He also admitted that "all [he] had to do . . . was flip that slide safety off and[,] as the officer sa[id,] it was ready to go. It was ready to fire." On redirect, the Defendant insisted that he never had his finger on the trigger when he removed the gun from its holster; it was outside the trigger well.

Following its deliberations, the jury acquitted the Defendant of the resisting arrest charge in Count 5; found him guilty of the lesser-included offense of reckless endangerment in Count 1; and found him guilty as charged in Counts 2 and 3. A sentencing hearing was held on April 21, 2011, and the trial court, after denying judicial diversion and probation,

sentenced him to serve one year for each conviction, concurrently, for a total effective sentence of one year in the Department of Correction. The Defendant subsequently filed a motion for a new trial, which raised multiple issues including the sufficiency of the evidence and the denial of judicial diversion and probation, and the trial court denied the motion, affirming the jury verdict. The Defendant then filed a timely appeal to this court.

## ANALYSIS

The Defendant contends that the evidence was insufficient to support his convictions for three counts of reckless endangerment. Regarding the first count, which involved Det. Curtis, the Defendant insists that because Det. Curtis testified that she was to the "rear side of the Defendant at the time of this incident and there was no proof that the pistol was at anytime pointed toward her[,]" Det. Curtis "was not actually in the zone of danger." Regarding the remaining two counts, involving Deputy Irvin and Det. Gilliland, the Defendant explains that because there was no proof that the Defendant had his hand on the trigger, that he had taken the safety off of the gun, nor that any shots were fired, his convictions cannot stand. The State responds that the evidence was sufficient to prove that the Defendant "recklessly withdrew his fully loaded handgun in close proximity of three peace officers, at least two of whom repeatedly admonished him not to do so." Further, the State responds that the trial court did not abuse its discretion in denying probation or judicial diversion because it followed the sentencing principles and guidelines and placed the reasons for its denial on the record.

### I. Sufficiency of the Evidence

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the

evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Tennessee Code Annotated section 39-13-103 states that a person is guilty of reckless endangerment when he "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." Id. -103(a), (b)(2). When committed with a deadly weapon, the offense is a Class E felony. Id. -103(b)(2). Section 39-11-302(c) states that a person

> acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

The danger of death or serious bodily injury is considered imminent only when the person was "placed in a reasonable probability of danger as opposed to a mere possibility of danger." State v. Goodwin, 143 S.W.3d 771, 777-78 (Tenn. 2004) (quoting State v. Payne, 7 S.W.3d 25, 28 (Tenn. 1999)). Our supreme court has explained that "the 'zone of danger' is that area in which a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury if others were present in that zone or area." Id. at 778. Furthermore, for a defendant to be convicted of reckless endangerment, "the State must show that a person or class of persons were in an area in which a reasonable probability of danger existed." Id.

After reviewing the record in a light most favorable to the State, we conclude that there was sufficient evidence from which a reasonable jury could conclude that the Defendant recklessly engaged in conduct that placed or might have placed the officers in imminent danger of death or serious bodily injury. Deputy Gilliland testified that the

Defendant removed the gun from the holster and pointed it directly at him. Detective Curtis testified that she told the Defendant to "stop" multiple times, but he continued to remove the gun from its holster. She also testified that she was afraid that she would be shot after the Defendant failed to follow her commands, so she attempted to place him in a headlock. Officer Irvin testified that, seeing Det. Curtis rush the Defendant, he ran to assist her, knocking both her and the Defendant to the ground. He further testified that the gun was pointed at him briefly when Deputy Gilliland attempted to disarm the Defendant. Finally, Mr. Suggs testified that the handgun safety course instructs students that, when approached by officers, they should inform officers that they have a gun and permit and then await further instructions from the officers to avoid alarming them. Further, the Defendant admitted that all he had to do was slide the safety, and the gun would have been ready to fire. The Defendant's failure to await instructions from the officers and, instead, removing the gun from its holster and holding it in an unsafe position was reckless behavior. This recklessness placed the officers in imminent danger of being shot, which presented more than a "mere possibility" that the officers would sustain serious bodily injury or death. As such, the Defendant is not entitled to relief on this issue.

*II. Denial of Probation*

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). This standard of review also applies to "the questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2010),

Sentencing Comm'n Cmts.; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

The Defendant was eligible for probation because the "sentence actually imposed upon [her was] ten (10) years or less." Tenn. Code Ann. § 40-35-303(a). Thus, the trial court was required to automatically consider probation as a sentencing option. Tenn. Code Ann. § 40-35-303(b). However, no criminal defendant is automatically entitled to probation as a matter of law. State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997). The defendant has the burden of establishing his or her suitability for full probation. See State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). The defendant must demonstrate that probation will "subserve the ends of justice and the best interests of both the public and the defendant." Hooper v. State, 297 S.W.2d 78, 81 (Tenn. 1956), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9-10 (Tenn. 2000).

In determining any defendant's suitability for alternative sentencing, the trial court should consider whether

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn.Code Ann. § 40-35-103(1)(A)-(C). A trial court should also consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. Tenn. Code Ann. § 40-35-103(5); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4).

In imposing a sentence of incarceration, the trial court found that while it did not see any reason to isolate the Defendant, to put him in jail to keep the public safe, to rehabilitate him, or to punish him so he does not do it again, a suspended sentence was not appropriate due to a "great problem" regarding general deterrence. The trial court further found that

[O]ne of the things that keeps law enforcement officers alive and keeps them

from harming people that they come into contact with is that people know, you know, you can't resist the lawful commands of a law enforcement officer. If you do you might get killed or if you do you might get beaten over the head or whatever, and this is a person who was convicted of three separate cases, three separate incidences of reckless endangerment toward law enforcement officials in a situation that -- and I realize it's just a few minutes of his life, but I find that it is such a dangerous situation, the consequences of not treating this type of situation seriously are such that I think a suspended sentence is not appropriate.

Finally, the trial court also found that granting probation, in a case as serious as this, would not subserve the interests of justice. The trial court's findings clearly evince that it concluded that confinement was necessary to avoid depreciating the seriousness of the offense and to provide an effective deterrent to others likely to commit similar offenses. Because the record reflects that the trial court considered the appropriate sentencing considerations, its determination is presumptively reasonable. As such, the Defendant is not entitled to relief on this issue.

### III. Denial of Diversion

A "qualified defendant" is eligible for judicial diversion if he or she is found guilty or pleads guilty to a Class C, D, or E felony, has not previously been convicted of a felony or a Class A misdemeanor, has not been granted judicial diversion previously, and is not seeking deferral under an excluded offense. Tenn. Code Ann. § 40-35-313(a)(1)(B)(i). The decision to grant judicial diversion lies within the discretion of the trial court and will not be disturbed on appeal unless it is shown that the trial court abused its discretion. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). In other words, a denial of judicial diversion will not be overturned if the record contains any substantial evidence to support the trial court's action. Id.

When making a determination regarding judicial diversion, the trial court must consider the following factors: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's mental and physical health; and (6) the deterrent effect of the sentencing decision to both the defendant and other similarly situated defendants. State v. Lewis, 978 S.W .2d 558, 566 (Tenn. Crim. App. 1997). The decision should be based on whether the grant of diversion will serve the ends of justice for both the public and the defendant. Id. The trial court may consider the following additional factors: "[the defendant's] attitude, behavior since arrest, prior record, home environment, current drug

usage, emotional stability, past employment, general reputation, marital stability, family responsibility and attitude of law enforcement." State v. Washington, 866 S.W.2d 950, 951 (Tenn. 1993) (quotation omitted). A trial court must weigh all of the required factors in determining whether to grant judicial diversion. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993)).[3] Finally, this court has previously held that "a trial court should not deny judicial diversion without explaining both the specific reasons supporting the denial and why those factors applicable to the denial of diversion outweigh other factors for consideration." State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997) (citing Bonestel, 871 S.W.2d at 168).

In the instant case, the trial court explained that it was denying diversion because the circumstances of the offense were such that to grant diversion would not subserve the ends of justice.[4] The trial court also explained, as noted above, that it did not see any reason to isolate the Defendant, to put him in jail to keep the public safe, to rehabilitate him, or to punish him so he does not do it again; no weight was assigned to either of these factors. Further, the trial court noted that the Defendant had an exemplary record and that it believed all of the evidence presented, regarding such as true; again, no weight was assigned to this factor. However, as previously explained in detail, it found that the need for general deterrence was "great[.]" The trial court also found that the nature of the offense outweighed aspects of the Defendant's character, the latter presumably referring to the many letters admitted on the Defendant's behalf, although not explicitly stated. The only factor it appears that the trial court did not consider at all was the Defendant's mental and physical health. This omission, coupled with the trial court's failure to assign weight to the factors noted above and explain how they were outweighed by the "nature" of the offense and need for

---

[3] The State cites to a recent opinion of this court applying the Bise standard of review to judicial diversion, see State v. Kiara Tashawn King, No. M2012-00236-CCA-R3-CD, 2013 WL 793588, at *6-7 (Tenn. Crim. App. Mar. 4, 2013), perm. app. granted, (Tenn. Aug. 14, 2013). See also State v. Lewis Green, No. W2011-02593-CCA-R3-CD, 2013 WL 1282319, at *9 n.1 (Tenn. Crim. App. Mar. 28, 2013), perm. app. filed, (Tenn. May 29, 2013). These cases stand for the propositions that (1) the Bise standard of review affording trial court sentencing decisions a presumption of reasonableness applies to a court's grant or denial of judicial diversion, and (2) the previous principles guiding this court to reverse a denial of judicial diversion for a trial court's failure to consider expressly "one or more of the seven legally-relevant factors (or merely because it failed to specify why some factors outweighed others)" is no longer good law. Green, 2013 WL 1282319, at *9 n.1; King, 2013 WL 793588, at *6-7. However, we respectfully disagree with those cases and conclude that we are bound by Electroplating, Inc. and Parker. In so concluding, we join in the rationales provided in the concurring opinions of State v. Paresh J. Patel, No. M2012-02130-CCA-R3-CD, 2013 WL 3486944 (Tenn. Crim. App. July 10, 2013) (Tipton, P.J., concurring and dissenting) (Witt, J., concurring).

[4] Other than this explicit statement regarding diversion, the trial court appears to discuss its reasons for denying probation and judicial diversion jointly, mixing the relevant considerations together.

general deterrence, was error. However, such error was harmless because this court has repeatedly held that when a trial court has properly denied probation, there is no need to remand for further proceedings regarding judicial diversion. See, e.g., State v. Carletha Jefferson, No. W2012-00616-CCA-R-CD, 2013 WL 3968793, at *7 (Tenn. Crim. App. Aug. 1, 2013) (This court did not remand on judicial diversion because the sentence of confinement was otherwise justified.); State v. Jeremy Brandon Scott, No. M2010-01632-CCA-R3-CD, 2011 WL 5043318, at *10 (Tenn. Crim. App. Oct. 24, 2011) ("As we believe there was a sound basis for the denial of full probation . . . we conclude the trial court's procedural failures [in considering judicial diversion] constitute harmless error."); State v. Jared M. Barnes, No. E2001-00325-CCA-R3-CD, 2001 WL 1565484, at *7 (Tenn. Crim. App. Dec. 10, 2001) (This court concluded that even if the trial court erred in its judicial diversion decision, it would not have changed the result, incarceration.). Because we have previously concluded that the trial court's denial of probation was proper, we further conclude that the trial court's omissions regarding the judicial diversion findings were harmless beyond a reasonable doubt.

## CONCLUSION

Based upon the foregoing, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE